# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| UNITED STATES OF AMERICA, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) CRIMINAL ACTION |
| JOHN D. HUDSON, | ) No. 13-20063-01-KHV |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on the government's Motion To Review Release Order (Doc. #16) filed June 7, 2013. On June 12 and 13 and July 30, 2013, the Court held a hearing on the motion. Based on the below analysis, the Court finds that no condition or combination of conditions will reasonably assure defendant's appearance as required and the safety of any other person and the community. Defendant will therefore be detained pending trial.

## Factual Background

The Court takes judicial notice of the Pretrial Services Report prepared May 24, 2013, and the proffers and evidence presented at the detention hearing on May 29 and June 7, 2013 and at the review hearing on June 12 and 13 and July 30, 2013. Based on the record evidence, the Court finds the following facts.

A female Confidential Informant ("CI") provided certain information about defendant to agents with the Federal Bureau of Investigations ("FBI"). In 2007, when the CI met defendant, he was a detective for the Police Department in Kansas City, Kansas ("KCKPD"). The CI and defendant had periodic contact and in December of 2010, they began a romantic relationship. In January of 2011, an FBI investigation led to the arrest of several officers in KCKPD's Selective,

Crime, Occurrence, Reduction Enforcement ("SCORE") Unit. Three SCORE officers pled guilty to federal civil rights violations. The SCORE takedown did not involve defendant, but he had close friends who were arrested and convicted as part of the federal investigation. The CI stated that after the SCORE takedown, defendant became very paranoid and angry toward the judicial system.

On November 20, 2011, at the rehearsal dinner for his sister's wedding, defendant was drinking alcohol and became extremely aggressive and disruptive. During the dinner, defendant asked the maid of honor if she could get him oxycontin. Defendant's sister, who had seen defendant abuse alcohol on prior occasions, had defendant removed from the dinner. Defendant's sister testified that after the incident, she was fearful of defendant and would be afraid of him if he is released.

In December of 2011, defendant told the CI that he had resigned from the police department because of an internal affairs investigation related to his personal use of a KCKPD vehicle outside of Kansas City, Kansas and his attempt to mask the signal on the GPS unit of the vehicle. Defendant began to tell the CI that "they'll get their's" and that he will "have his revenge," referring to the individuals responsible for the arrest of the SCORE officers and the internal affairs investigation involving defendant.[1]

---

[1] Defendant believed that the following individuals were involved in either or both investigations: Chief Rick Armstrong, Lieutenant Colonel Terry Ziegler, Major John Cosgrove, Captain Greg Lawson, Captain Curtis Nicholson and Detective Mark Bundy. Captain Lawson was integral in providing information to the FBI during the federal SCORE investigation. Major Cosgrove initiated the internal investigation against defendant and Detective Bundy is the current President of the Fraternal Order of Police. Defendant believed that Detective Bundy knew that officers were internally investigating him but did not tell him. Defendant sometimes would include Detectives Kelly Herron and Michael Vivian on the list. Detectives Herron and Vivian conducted the internal investigation of defendant.

At a retirement party at a local restaurant on December 9, 2011, defendant approached KCKPD Detective Steve Owen. Defendant knew that Detective Owen was a good friend of Detective Herron. Defendant told Detective Owen that Detective Herron better not cross paths with him. Defendant told Detective Owen that Detective Herron better "watch himself" and that Detective Owen "hasn't seen the last of John Hudson."

In February of 2012, defendant got a Grim Reaper tattoo on his left arm. The tattoo had six skulls around the Grim Reaper and a phrase which is Latin for "Eye for an eye, tooth for a tooth and you're next." Defendant told the CI that the six skulls represent the six "black rats."[2] He told the CI that he was going to get a crucifix with six rats around the tattoo when the six "black rats" had been eliminated. Defendant talked to the CI about the individuals involved in the two investigations "getting their due," and that he himself would get what was owed him.

In May or June of 2012, defendant borrowed money from his mother and as collateral, he left an unloaded AR-15 assault-style rifle in a case with a 30-round clip at her house. Defendant's mother did not ask for or want the gun.

In July of 2012, defendant told the CI that he had demons, that he was in a "dark place" and that he had a plan involving Major Cosgrove that needed to take place. Defendant told the CI that his plan would be to "take him out" and that he would make it seem random. Defendant talked to the CI about his shooting abilities and told the CI that he wanted Major Cosgrove to know that it was him. Defendant told the CI that before he would start his plan, he wanted to take care of a few things such as getting his medical disability, disappearing by getting rid of his phones and anything

---

[2] Defendant usually referenced the following six individuals as the "black rats:" Chief Armstrong, Lieutenant Colonel Ziegler, Major Cosgrove, Captain Lawson, Captain Nicholson and Detective Bundy. Defendant sometimes would include Detectives Herron and Vivian on the list.

traceable and filing for 50 per cent custody of his children.

In September or October 2012, at Johnnie's Tavern, defendant hit another patron in the throat and knocked him out. Defendant argues that he did not hit the individual, but instead put him in a "sleeper hold." The distinction is immaterial because in either event, defendant's aggressive behavior caused the victim to briefly pass out.

Near the end of November of 2012, the CI noticed that defendant had an extreme change in behavior. During this period, he had a falling out with his mother as well as the CI's mother. Defendant began making comments about how he thought he would get shot in the back, and he refused to keep the blinds open where he resided.

In December of 2012, defendant told the CI that he is a trained killer, that he is able to be lethal with just his body, and that he knows enough about crime scenes that he can get away with homicide. Defendant also spoke about his tattoo and went off his medication because he felt "numb."

The CI reported that as of March of 2013, defendant still had a KCKPD badge that he had used in traffic stops and to get into county buildings after hours. Defendant does not have a license to carry and conceal a firearm, and is not licensed to carry a firearm as a retired officer. The CI reported that defendant was always armed. He kept a handgun in his pocket or on his back waistline. The CI stated that in defendant's residence, he kept a shotgun by the front door, a shotgun in the laundry room, an assault rifle in the bedroom and a handgun in the kitchen.

In March of 2013, defendant told the CI that he would "start taking them out, one by one." He described how prior to enacting this plan, he would talk with his 12-year-old son and explain how he had to stand on his principles, how he knew he was going to go to prison for what he was

going to do and how he knew that he would probably get lethal injection. As recently as March 31, 2013, defendant stated that he wants to "go poof" (meaning that he was going to become untraceable) and that he needed to enact his plan.

On May 10, 2013, during and following a parent-child soccer game, defendant and his ex-wife's husband Daniel were involved in an altercation. Defendant pushed Daniel, who is much smaller than defendant, with both hands in the chest. On May 12, 2013, defendant sent a text message to the CI, stating in part as follows:

> Daniel tried to fight me on Friday night at the kids soccer banquet. . . . I grabbed him and restrained him while telling him to calm down. . . . I shove him back which results in him back peddling ten steps before sliding across the gravel. . . he gets back up and gets within five feet of me, and spits on me!!!! . . . . I ended up going to the Clay County Services Office in order to document it. . . . I do not know how I didn't beat him to death . . . It was ridiculous, and I don't know how I kept my cool... he's luck[y] that he spits like a bitch and didn't hit me in the face, or he'd be in ICU or dead.

On May13, 2013, defendant sent text messages to the CI, stating in part as follows:

> there must have been Angels with bazookas holding me back, because nobody spits on me. . . he had a near death experience and just didn't realize it. . . . [My Son] needed to see me actually smash him, but [Daughter] didn't... The only break he got was me not killing him . . . fuck both of those fake ass mind fuckers.

On May 20, 2013, Magistrate Judge James P. O'Hara issued a search warrant for defendant's residence in Kansas City, Kansas. On May 23, 2013, FBI agents executed the warrant and recovered multiple guns and ammunition. During the search, agents observed two ballistic vests including one with "Police" on it. Agents also saw two KCKPD badges in a kitchen cupboard. In defendant's wallet on his person, he had an official KCKPD identification, credentials and another badge. Agents later confirmed that KCKPD had not authorized defendant to keep these credentials.

During the search, agents observed numerous pill bottles in every room of the residence.

Only some of the bottles were labeled and in defendant's name. The CI reported that defendant self-medicates with both prescribed narcotics (including anti-anxiety medication and anti-depressant medication) and non-prescribed narcotics (including steroids, morphine and oxycodone). The CI also stated that defendant drinks alcohol heavily and that many of his incidents of violence are related to alcohol abuse.[3]

Dr. Kathleen King, defendant's psychotherapist, opined that based on her visits with defendant on a sporadic basis since 2008, she did not consider defendant to be a danger to society in general or anyone in particular if released from custody.[4]

The CI in this case is a licensed social worker. The CI and defendant had a romantic relationship. Defendant did not consult the CI on a professional basis. The CI used her knowledge and experience as a social worker to talk things through with defendant when he was struggling emotionally. The CI made no reports, records or other professional findings during these communications. During defendant's relationship with the CI, defendant was actually seeing a professional psychotherapist. At one point, the CI helped defendant review an application for

---

[3] At the review hearing, defendant called Mark Bundy, a KCKPD detective, who testified that on one occasion, he told defendant's sister that defendant had an "issue" when he drank alcohol.

[4] As a prerequisite of pretrial release, Magistrate Judge David J. Waxse essentially ordered defendant to provide psychiatric evidence of non-dangerousness. This evidence is problematic at many levels. First, it is the government's burden to prove that defendant's release would pose a danger to the community – not defendant's burden to prove the opposite. Second, while defendant waived any psychotherapist-patient privilege with respect to Dr. King's opinion by submitting it to Judge Waxse, it would be inappropriate – given the coercive nature of Judge Waxse's order – for the Court to extend the waiver to all psychiatric communications which might have some bearing on this case. Finally, in any event, Dr. King's conclusory opinion, unsubstantiated by further evidence and untested by cross-examination, is essentially worthless. Defendant did not include Dr. King among witness which he called at the detention hearing and the Court does not rely on her opinion.

mental health benefits to be filed with the Kansas Public Employees Retirement System (KPERS).

The CI eventually told a friend, who was a police officer, about defendant's threats and mental condition. The CI did not want to disclose defendant's threats and mental condition to law enforcement officers, but she eventually talked to police in early April of 2013.

A grand jury charged John D. Hudson with four counts of retaliation against Chief Armstrong, Captain Lawson and others for giving FBI agents information related to the commission or possible commission of federal criminal civil rights violations in violation of 18 U.S.C. §1513(b)(2). See Indictment (Doc. #1) filed May 22, 2013. In particular, the indictment charges that (1) in February of 2012, defendant told an individual that Chief Armstrong, Captain Lawson and certain other law enforcement officers were "black rats" who would be "eliminated" and (2) in March of 2013, defendant told an individual he would "start taking them out one by one," referring to Chief Armstrong, Captain Lawson and certain other law enforcement officers .

On May 29 and June 7, 2013, Magistrate Judge David J. Waxse held a detention hearing. Over the government's objection, Judge Waxse granted a $25,000 bond and ordered that defendant be released on conditions. Order Setting Conditions Of Release And Appearance Bond (Doc. #21). The government seeks review of the release order.

## Standard Of Review

The government may seek review of a magistrate judge's order of release under 18 U.S.C. § 3145(a)(1). The district court reviews de novo a magistrate judge's order of release or detention. See United States v. Lutz, 207 F. Supp.2d 1247, 1251 (D. Kan. 2002); United States v. Burks, 141 F. Supp.2d 1283, 1285 (D. Kan. 2001). The district court must make its own de novo determination of the facts and legal conclusions with no deference to the magistrate judge's findings. See Lutz,

207 F. Supp.2d at 1251. A de novo evidentiary hearing, however, is not required. See id. The district court may either "start from scratch" and take relevant evidence or incorporate the record of the proceedings conducted by the magistrate judge including the exhibits admitted. United States v. Torres, 929 F.2d 291, 292 (7th Cir. 1991). The Federal Rules of Evidence do not apply to detention hearings. See 18 U.S.C. § 3142(f). The Court may allow the parties to present information by proffer or it may insist on direct testimony. See Torres, 929 F.2d at 291. The Court also may incorporate the record of the proceedings conducted by the magistrate judge, including the exhibits he admitted. Lutz, 207 F. Supp.2d at 1251; see United States v. Chagra, 850 F. Supp. 354, 257 (W.D. Pa. 1994).

## Standards For Detention

Under the Bail Reform Act of 1984, 18 U.S.C. § 3141 et seq., the Court must order an accused's pretrial release, with or without conditions, unless it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). In making this determination, the Court must take into account the available information concerning –

> (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including – (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

The government has the burden to show that no condition or combination of conditions would reasonably assure the accused's presence in later proceedings and/or the safety of other persons and the community. Lutz, 207 F. Supp.2d at 1251 (burden of persuasion regarding risk of flight and danger to community always remains with government). The government must show by a preponderance of the evidence that defendant presents a serious flight risk. The government must prove dangerousness to any other person or the community by clear and convincing evidence. Id. at 1252.

## **Analysis**

Initially, the Court addresses defendant's assertion of privilege. Defendant argues that his statements to the CI are protected by the psychotherapist-patient privilege.[5] A psychotherapist-patient testimonial privilege applies to "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment." Jaffee v. Redmond, 518 U.S. 1, 15 (1996). To invoke the benefit of the privilege, defendant bears the burden of showing that (1) the CI is a licensed psychotherapist or clinical social worker, (2) his

---

[5] Defendant also asserts that records which he submitted to the State of Kansas when he applied for medical disability retirement are privileged and should not be considered for purposes of the review hearing. Government counsel has retained these records in a sealed envelope and the Court has not reviewed or considered them. At the hearing on June 12 and 13, 2013, the Court advised defense counsel that if defendant wanted to pursue the assertion of privilege as to the records which he submitted to KPERS, he needed to show how the privilege applied on a document-by-document basis. Defendant has not provided the Court any further information on how or why the privilege should apply to the records either generally or on a document-by-document basis. The Court therefore overrules as moot defendant's assertion of privilege related to the records. Moreover, even without considering the records, the Court finds that defendant should be detained.

communications to the CI were confidential and (3) defendant made the communications during the course of diagnosis or treatment. United States v. Romo, 413 F.3d 1044, 1047 (9th Cir. 2005); see Jaffee, 518 U.S. at 16.

Defendant has not satisfied his burden to show that he made any statements to the CI "in the course of diagnosis or treatment." To determine whether a meeting occurred "in the course of diagnosis or treatment," the Court considers the totality of the circumstances. Romo, 413 F.3d at 1047. Relevant factors may include the historical nature of the relationship between the individual and his confidante; the patient's purpose in making the communication; the nature of the contact; the timing and location of the communication; objective data, such as medical records, which corroborate the counseling contact; and whether mental health services were provided or requested during the communication. Id.

To support his assertion of privilege, defendant relies solely on the CI's testimony. Her testimony does not establish, however, and defendant has not otherwise shown, that he made any statements to the CI "in the course of diagnosis or treatment." The CI held herself out as defendant's girlfriend, not as his therapist. Defendant did not consult the CI on a professional basis. The CI made no reports, records or other professional findings regarding their communications. During defendant's relationship with the CI, defendant was seeing Dr. King, a psychotherapist, on a professional basis. Defendant discussed psychological issues with the CI, but he did so because she was his girlfriend, not because he was seeking "diagnosis or treatment" from her. See id. at 1048 (privilege applies only when therapist practices her craft, not whenever therapist and patient communicate). For these reasons, the Court overrules defendant's assertion of privilege as to his statements to the CI.

**I.     Nature And Circumstances Of The Offenses**

The charged offenses of witness retaliation are crimes of violence because they involve the "threatened use of physical force." 18 U.S.C. § 3156(a)(4); see 18 U.S.C. § 1513(b) (crime of witness retaliation). The nature and circumstances of the offenses weigh in favor of detention.

**II.    Weight Of The Evidence**

The CI gave highly credible testimony that defendant threatened the use of physical force against a number of individuals, including specific threats in February of 2012 and March of 2013 identifying Chief Armstrong, Captain Lawson and other KCKPD officers. The weight of the evidence favors detention.

**III.   History And Characteristics Of Defendant**

Defendant is 42 years old and has resided in the Kansas City metropolitan area his whole life. Defendant's father is deceased. Defendant no longer has contact with his mother or his sister. From 1995 to 2005, he was married to Renee Hill and had two children who currently reside with her.

Defendant has a bachelor's degree in Justice Systems and a master's degree in Business Administration. Defendant is currently employed as a law enforcement instructor at Herndon Career Center.

Defendant has a number of firearms in his residence and he has routinely carried a firearm. He has made numerous threats and has shared his plan to take out or eliminate a number of individuals. Defendant has also acted violently on a number of occasions. Several witnesses testified that they have never seen defendant act violently. Even so, the CI had much more contact with defendant since December of 2010, and provided highly credible testimony about defendant's violent behavior and desire to get revenge against the officers who were responsible for the arrest of the SCORE officers and the internal affairs investigation involving defendant. Defendant's sister

also testified that she is fearful of defendant. Finally, defendant made several disturbing comments to the CI by text and in person. These comments suggest that defendant believes he can get away with homicide, that he wants revenge on several KCKPD officers and that his ex-wife's husband is lucky to be alive after attempting to spit on him. Because defendant has a history of violence and threats against law enforcement officers, his history and characteristics indicate that he is not capable of complying with conditions of release and that he poses a danger to the community.

**IV.      Danger To The Community**

Before releasing defendant on any set of conditions, the Court must be satisfied that he will not pose a danger to any other person or to the community. See 18 U.S.C. § 3142(b). Here, as noted, defendant has a history of violence as well as threats against a number of KCKPD officers.

Defendant presented various witnesses who testified to his non-violent and peaceable nature. The Court does not necessarily discredit that testimony so much as it recalls the parable of the elephant that is common to many religious traditions. A Jain version of the parable says that six blind men were asked to determine what an elephant looked like by feeling different parts of the elephant's body. The blind man who feels a leg says the elephant is like a pillar; the one who feels the tail says the elephant is like a rope; the one who feels the trunk says the elephant is like a tree branch; the one who feels the ear says the elephant is like a hand fan; the one who feels the belly says the elephant is like a wall; and the one who feels the tusk says the elephant is like a solid pipe. A king explains to them: "All of you are right. The reason every one of you is telling it differently is because each one of you touched the different part of the elephant. So, actually the elephant has all the features you mentioned." Here, defendant may be both generally non-dangerous and highly dangerous to specific individuals in specific situations – the two scenarios are not mutually exclusive. Therefore, notwithstanding defendant's evidence, the Court finds that the government

has carried its burden of proving by clear and convincing evidence that defendant presents a danger to the community if released prior to trial and that no set of conditions can reasonably assure the safety of the community if he is released.

## V. Balance Of Factors

Defendant's ties to the Kansas City metropolitan area weigh in favor of release. But this factor is outweighed by the other factors discussed above, which indicate that defendant has a history of violence and threats against others. Based on the indictment, the record before the magistrate judge, including the pretrial services report, and the evidence presented at the hearing on June 12 and 13 and July 30, 2013, the Court concludes that defendant poses a danger to the community and that no set of conditions of release will reasonably assure his appearance as required and the safety of any other person and the community.

**IT IS THEREFORE ORDERED** that the government's Motion To Review Release Order (Doc. #16) filed June 7, 2013 be and hereby is **SUSTAINED**. Defendant John D. Hudson shall remain in custody pending trial.

**IT IS FURTHER ORDERED** that defendant's Motion To Invoke Privilege (Doc. #31) filed June 12, 2013 be and hereby is **OVERRULED**.

**IT IS FURTHER ORDERED** that defendant's Motion To Invoke Privilege Re: Statements To CI (Doc. #41) filed July 19, 2013 be and hereby is **OVERRULED**.

Dated this 9th day of August, 2013 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge
